[Cite as *Hartman v. Erie Ins. Co.*, 2017-Ohio-668.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Chad Hartman, et al.                                        Court of Appeals No. WD-16-022

　　　　Appellants                                          Trial Court No. 2015CV0434

v.

Erie Insurance Company                          **DECISION AND JUDGMENT**

　　　　Appellee                                          Decided:  February 24, 2017

* * * * *

Stephen B. Mosier, for appellants.

Gordon D. Arnold and Carl A. Anthony, for appellee.

* * * * *

**SINGER, J.**

{¶ 1} Appellants, Chad and Erin Hartman, appeal from the April 18, 2016 judgment of the Wood County Court of Common Pleas granting summary judgment to appellee, Erie Insurance Company, and dismissing the claims of appellants. For the reasons which follow, we affirm.

{¶ 2} On appeal, appellants assert the following assignments of error:

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED WHEN IT STRUCK ALL OF PLAINTIFFS' EVIDENCE ON THE STATED GROUND THAT PLAINTIFFS FAILED TO PRESENT IT IN THE FORM OF AN AFFIDAVIT, WHEN PLAINTIFFS' EVIDENCE WAS IN FACT SUPPORTED BY AFFIDAVIT SWORN TO UNDER OATH BEFORE A PROPER OFFICER, FULLY COMPLIANT WITH RULE 56 (E).

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT MISCONSTRUED THE HOMEOWNERS' INSURANCE POLICY, AND ERRED IN GRANTING SUMMARY JUDGMENT AGAINST RATHER THAN IN FAVOR OF THE POLICYHOLDERS ON THE "ADDITIONAL ENDORSEMENT" COVERAGE FOR "LOSS CAUSED BY WATER WHICH BACKS UP THROUGH SEWERS OR DRAINS."

ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT MISCONSTRUED THE HOMEOWNERS' INSURANCE POLICY, AND ERRED IN GRANTING SUMMARY JUDGMENT AGAINST RATHER THAN IN FAVOR OF THE POLICYHOLDERS ON THE COVERAGE PERTINENT TO "FUNGI, WET OR DRY ROT OR BACTERIA."

ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERRED IN OVERRULING PLAINTIFFS'
TIMELY EVIDENTIARY OBJECTIONS TO "EXPERT" TESTIMONY
PROFFERED BY ERIE, WITHOUT PROPER FOUNDATION AND
CONTRARY TO EVIDENCE RULE 702 AND 703, AND ERRED
FURTHER IN RELYING ON THAT CONTROVERTED TESTIMONY
AS ITS BASIS FOR GRANTING SUMMARY JUDGMENT AGAINST
THE POLICYHOLDERS.

{¶ 3} Appellants brought suit against appellee alleging breach of contract and a breach of appellee's duty of good faith and fair dealing. Appellants allege that on May 29, 2015, their home and personal property was damaged by water backing up from the storm drain system (hereinafter the "first claim"). Appellants reported the first claim to appellee, who accepted the loss as being within the coverage of the policy. Appellee reimbursed appellants $11,500 for their loss, $10,000 for the damage caused by the sump pump back up and $1,500 as an additional payment for debris removal by a restoration company. Appellants asserted this was only a partial payment of the loss, which appellee ceased to continue to pay after a second claim was made.

{¶ 4} Appellants allege that on June 27, 2015, their home and personal property was again damaged by the backup of water from the storm drain system (hereinafter the "second claim"). Appellee denied the second claim on the ground that the anti-concurrent causation clause precluded recovery. Appellants asserted that appellee had

3.

represented to appellants that the separately-purchased endorsement was not subject to any other policy exclusions.

{¶ 5} Appellants argued they are also entitled under the policy provisions for "Additional Payments" to reimbursement for the cost of testing the property for fungi or bacteria and remediating the damage from fungi or bacteria. They assert they were never informed of this coverage by appellee.

{¶ 6} Appellants moved for partial summary judgment. The parties agreed that the only issue before the court on summary judgment was whether there was coverage under the policy for both loss claims. Appellants asserted that while the basic policy provides an exclusion for "water damage" (hereinafter the "water damage exclusion"), appellants purchased, for an additional premium, an endorsement for coverage of "Loss Caused By Backup Of Sewers Or Drains" (hereinafter the "backup coverage endorsement"), which did not separately restate the water damage exclusions listed in the main policy.

{¶ 7} Appellee also moved for summary judgment on all of the claims asserting that it paid the first claim in full and coverage for the second claim was excluded under the policy arguing the two loss claims were not identical. The first claim was based on water entering the basement of the home through the sump pump system. The second claim was based upon water entering the basement of the home through the sump pump system and through the basement windows.

4.

**{¶ 8}** Appellee attached to its motion the affidavits of Alexander Davis, appellee's insurance agent who handled the first claim; John Fetters, appellee's insurance agent assigned to handle the second claim; and Stephen Bostwick, a registered architect, who specialized in forensic evaluations of homes regarding water damage and the existence of mold.

**{¶ 9}** Davis attested that he initially advised Mrs. Hartman that there was a coverage deductible and the limit for the claim was $10,000, plus an additional percentage of the limit was available for debris removal. Davis inspected the home and took photographs. He completed an estimate of the repairs and completed the claim when he received the invoice from the restoration company hired by the Hartmans. Davis further attested the total payout on the claim was $11,500 and appellee did not stop making payments on the first claim.

**{¶ 10}** In a second affidavit, Davis attested that during the course of handling the first claim, he "was never made aware of any fungi or mold, or anything that would have triggered coverage under the 'Fungi, Wet or Dry Rot Or Bacteria' provision in the insurance contract. * * * Neither of the Hartmans, nor anyone else, told me there was a problem with, or existence of, anything that would have triggered his coverage." Davis understood from Mr. Hartman that one of the functions of the restoration company was to prevent problems with mold and there was nothing in the invoice suggesting fungi or bacteria were found on the premises. Upon his inspection of the house after the restoration work, Davis did not see any evidence of mold or observe anything that would

5.

lead him to believe the fungi/bacteria coverage would have been triggered and the Hartmans did not inquire about such coverage.

{¶ 11} Furthermore, Davis attested he did not learn of the Hartmans' claim of hydrostatic pressure damage occurring during the first claim incident until November 2015 in connection with this litigation. Davis never observed such damage when he inspected the property.

{¶ 12} Fetters attested he exchanged e-mail messages with Mr. Hartman regarding the second claim. Fetters authenticated a copy of an email Mr. Hartman sent to Fetters, in which Mr. Hartman stated:

> the area experienced a very substantial amount of rainfall within a 12-15 hour period. I once again had water entering into and accumulating several inches deep in my basement * * * this time from groundwater entering the basement through the basement windows and presumably also by back-up from the storm drain system and up through the basement sump pump. The storm drain system was overwhelmed, and overflowed forming a large pool and accumulating around the foundation of my home. The foundation and basement floor buckled and cracked * * *. Due to the second incident, several inches of * * * insulation and drywall have become saturated and will necessarily be required to be removed to prevent mold from forming.

Fetters also attested Mr. Hartman called and provided more details about the loss, telling Fetters the water trickled through the windows, but mostly came through the sump crock.

6.

Fetters attested that he informed Mr. Hartman coverage would probably be excluded if water came through the windows.

{¶ 13} Fetters inspected the property and authenticated copies of photographs taken that day. Fetters attested there was a slope leading toward the house and mud could be seen on the windows, which was consistent with Mr. Hartman's initial e-mail statement that ground water entered the basement through the basement windows. Upon examination of all of the evidence, Fetters concluded that the loss was caused in part by surface water coming in through the windows of the basement, which was an excluded loss. He informed appellants the second claim was not a covered loss.

{¶ 14} In a separate affidavit, Fetters attested that during the time he handled the second claim, the Hartmans never said they believed mold was present or that fungi and bacteria entered the house from the water that entered the home through the windows and sump pump.

{¶ 15} Bostwick attested he was hired by appellee to inspect appellants' property in January 2015. Based on a review of the litigation documents, appellee's records, an examination of the property, and his education, training, and experience in the field, he opined, to a reasonable degree of architectural and scientific probability, as follows: During both claim incidences, water pooled above the culvert at the street and was not drained away from the house. "Some or all of the water which entered the house * * * included water stopped by the road and culvert from draining away from the house. * * * Some or all of the water which entered the house * * * included water which fell to the

7.

ground directly from rainfall.  None of the water which entered the house * * * backed up through the culvert."

{¶ 16} Bostwick further attested that during his inspection of the premises, Mr. Hartman told Bostwick that all of the water in the first claim incident entered the home through the sump pump.  Mr. Hartman used a second sump pump to keep the basement from flooding, but could not prevent six inches of standing water from filling the basement.  He stated no water entered the basement through the windows.  Bostwick found these statements consistent with the claim file.

{¶ 17} Furthermore, Mr. Hartman told Bostwick that surface water pooled at the windows and infiltrated the house at the windows during the second claim incident. Bostwick observed damage around and under the windows.  He opined the groundwater came into the house through or near the two windows as well as through the sump pump.

{¶ 18} Bostwick also opined that water from a recent rain, entering a house through a sump pump system, does not typically contain damaging fungi or bacteria levels in concentrations sufficient to cause damage to property or require cleaning procedures other than removal of the water and wiping down the surfaces because it is ground water and not sewage backup.  Therefore, appellants' home should not have been damaged by fungi or bacteria in the water after the first claim incident.  He also opined there was no property damage caused by wet rot or dry rot because this was not a sewage backup but ground water from a substantial rain.

8.

{¶ 19} During Bostwick's inspection, Mr. Hartman explained the work performed by the restoration company and Bostwick reviewed the company's invoice and photographs. All of the evidence indicated to Bostwick that the company did not remove any drywall after the first claim incident, but did remove the baseboards and drilled holes in the drywall at the baseboard level, and used dehumidifiers and other solutions to prevent mold. The restoration company's invoice did not indicate that the company found evidence of mold, but only states the company applied antimicrobial agents and took steps to prevent mold growth. Typically, Bostwick attested, companies doing such work will indicate on their invoice if they remediated actual mold.

{¶ 20} During Bostwick's inspection, the Hartmans pointed out several areas where they suspected mold was present. Mr. Hartman claimed to have scrubbed the walls with bleach but the mold returned after the second flooding incident. Bostwick attested he examined the areas identified by the Hartmans by scratching and smelling the substance. Based on his experience, Bostwick opined no mold was present because it did not smell like mold. He also used a moisture meter on several areas and all readings were in normal ranges, which would not have been conducive to mold growth. He did not chemically test the areas, but based on his experience, he would have expected to find higher moisture levels to support mold growth. He also did not have any photographic evidence of the presence of mold. However, he attested he could not rule out mold was possibly present.

9.

**{¶ 21}** Bostwick inquired about damage from hydrostatic pressure on the foundation during the first claim incident. Mr. Hartman denied seeing any such damage after the first claim incident and before the second claim incident. Bostwick could not find any evidence of hydrostatic damage in the photographs Davis had taken or in the claim file.

**{¶ 22}** Mr. Hartman identified damage he observed after the second claim incident which he believed was caused by hydrostatic pressure. Based on this information and Bostwick's own inspection, he agreed with Mr. Hartman that the home was damaged during the second flooding incident by hydrostatic/water pressure from below the floor/slab and foundation.

**{¶ 23}** On April 18, 2016, the trial court denied partial judgment to appellants and granted summary judgment to appellee and dismissed the claims of appellants despite the fact that the parties filed a joint notice on January 12, 2016, indicating that they agree that the only issue to be determined on summary judgment was the issue of coverage.

**{¶ 24}** The appellate court reviews the grant of summary judgment under a de novo standard of review. *Doe v. Shaffer,* 90 Ohio St.3d 388, 390, 738 N.E.2d 1243 (2000), citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Applying the requirements of Civ.R. 56(C), we uphold summary judgment when it is clear

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable

10.

minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

**First Assignment of Error**

{¶ 25} On appeal, appellants argue in their first assignment of error the trial court erred in striking the three declarations of Mr. Hartman on the ground the declarations did not meet the qualifications of affidavits required by Civ.R. 56(E).

{¶ 26} Appellants supported their motion with three separate "declarations" of Chad Hartman. After appellee moved to strike the declarations, appellants submitted a notarized affidavit of Chad Hartman, in which he confirmed each of the statements he made in the declarations. On April 18, 2016, the trial court granted appellee's motion to strike the three declarations because the documents did not meet the requirements for affidavits permitted by Civ.R. 56(E).

{¶ 27} We agree with the trial court that the declarations filed in compliance with 28 U.S.C. 1746 are insufficient to establish factual evidence permitted by Civ.R. 56(E). This federal statute governs federal cases and, therefore, is not applicable in a state court proceeding in Ohio. *Disciplinary Counsel v. Squire*, 130 Ohio St.3d 368, 2011-Ohio-5578, 958 N.E.2d 914, ¶ 45, fn. 3c; *Toledo Bar Assn. v. Neller*, 102 Ohio St.3d 1234, 2004-Ohio-2895, 809 N.E.2d 1152, ¶ 21.

11.

{¶ 28} Appellants further argue that the trial court did not address the notarized affidavit of Mr. Hartman, in which he affirmed all of his statements made in the prior declarations. Appellants filed a proper Civ.R. 56(E) affidavit on February 16, 2016, after the February 5, 2016 deadline for submitting evidence to the court had passed and without leave of court. The affidavit was clearly filed in response to appellee's February 19, 2016 motion to strike Hartman's declarations. The trial court did not discuss the admissibility of the later affidavit.

{¶ 29} A trial court has "a mandatory duty * * * to thoroughly examine all appropriate materials filed by the parties before ruling on a motion for summary judgment." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358, 604 N.E.2d 138 (1992), syllabus. However, the trial court has no duty to consider an untimely-filed affidavit, but may do so at its discretion. *Widlar v. Young*, 6th Dist. Lucas No. L-05-1184, 2006-Ohio-868, ¶ 37. We find the failure to consider or to mention the affidavit in this case was not an abuse of discretion. Appellants could have, but did not, petition the court to consider their untimely-filed affidavit as they did for their brief in opposition to the motion for summary judgment, to which Mr. Hartman's third declaration was attached.

{¶ 30} Appellants also argue appellee waived the right to challenge that the affidavit was untimely filed. We disagree. The issue on appeal is only whether the trial court abused its discretion in failing to consider the affidavit, not whether appellee objected to its admission.

{¶ 31} Therefore, we find appellants' first assignment of error not well-taken.

12.

## Second Assignment of Error

{¶ 32} In their second assignment of error, appellants argue the trial court misconstrued the backup coverage endorsement and limited its application to override only the exclusion for water from sewer or drain backups (exclusion paragraph 9.b.) and not all of the water damage exclusions.

## Policy Provisions

{¶ 33} Under "Property Protection, Section I," the insurance policy separately sets forth the coverage type ("dwelling and other structures" and "personal property") and the exclusions from coverage. Under each coverage type, the exclusion sections include identical anti-concurrent causation clauses:

"We" do not pay for loss resulting directly or indirectly from any of the following, even if other events or happenings contributed concurrently, or in sequence, to the loss.

{¶ 34} This clause was followed by identical water damage exclusions. These four water damage exclusions exclude coverage for losses caused:

9. by water damage, meaning:

a. flood, surface water, * * * storm surge or overflow of a body of water.

b. water or sewage which backs up through sewers or drains or water which enters into and overflows from within a sump pump, sump pump well or any other system designed to

13.

remove subsurface water which is drained from the foundation area.

**This exclusion** does not apply if Sewers or Drains Backup Coverage is shown on the 'Declarations.' However, the maximum amount shown on the 'Declarations' is the maximum amount 'we' will pay for any one direct loss caused by water or sewage which backs up through sewers or drains, or which enters into and overflows from within a sump pump, sump pump well or any other system designed to remove subsurface water which is drained from foundation area;

c.    water below the surface of the ground. This includes water which exerts pressure on, or flows, seeps or leaks through any part of a building or other structure, including sidewalks, driveways, foundations, pavements, patios, swimming pools or decks; or

d.    waterborne material carried or otherwise moved by any of the water referred to in his exclusion.

**This exclusion** applies, but is not limited to, escape, overflow or discharge, for any reason, of water or waterborne material from a dam, levee, seawall or any other boundary or containment system. (Emphasis added.)

It is undisputed that appellants purchased the "backup coverage endorsement" referenced in paragraph 9.b. The backup coverage endorsement in this case provides as follows:

"ERIESECURE HOME SELECT ENDORSEMENT – INCLUDING

COVERAGE FOR LOSS CAUSED BY BACKUP THROUGH SEWERS

OR DRAINS – OHIO"

* * *                     "ADDITIONAL COVERAGES"

* * *

COVERAGE FOR LOSS CAUSED BY WATER BACK UP

THROUGH SEWERS OR DRAINS

"**You**" have purchased Sewers or Drains Backup Coverage in the amount shown on the "**declarations**." The SECTION 1 policy deductible applies.

**Trial Court's Judgment**

{¶ 35} The trial court found appellee paid the first claim in full pursuant to the backup coverage endorsement. The trial court found there was undisputed evidence the second claim incident was caused by both surface water entering the home through the basement windows and by a backup of the sewer and drain. The trial court further found the policy excluded coverage for the second claim because of the anti-concurrent causation clause, which was not modified by the backup coverage endorsement.

15.

Furthermore, the court found that the hydrostatic pressure damage is also excluded from the policy pursuant to exclusion paragraph 9.c.

## Arguments

## Did the Backup Coverage Endorsement Override the Main Policy?

{¶ 36} Appellants first argue the backup coverage endorsement is not restricted to solely water damage caused by sewer and drain backups (exclusion 9.b.) because such a reading of the contract would render the backup coverage endorsement useless even though they paid an additional premium for backup coverage. They argue the backup coverage endorsement "'controls the policy insofar as it "enlarges, modifies, or restricts the terms" of the policy,'" and "'if there is any conflict between the rider and policy, "the rider controls in construing the contract especially where the provisions of the rider are more specific"'" citing *Penthouse Owners Associations, Inc. v. Certain Underwriters at Lloyds, London*, 612 F.3d 383, 386 (5th Cir.2010). Therefore, appellants argue the backup coverage endorsement must be interpreted more broadly to cover the loss in this case.

{¶ 37} We disagree. It is a basic contract principal that insurance policies and endorsements must be read together as one contract. *Ward v. United Foundries, Inc.*, 129 Ohio St.3d 292, 2011-Ohio-3176, 951 N.E.2d 770, ¶ 18. "[A]n exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (1992). *Accord Westfield Ins. Co. v. Hunter*, 128 Ohio St.3d 540,

16.

2011-Ohio-1818, 948 N.E.2d 931, ¶ 11; *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 6. An unambiguous insurance policy contract, which would include the exclusion and limitation provisions, must be enforced as written. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995). The court should attempt to construe the language "in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed." *Dealers Dairy Prods. Co. v. Royal Ins. Co.*, 170 Ohio St. 336, 164 N.E.2d 745 (1960), paragraph one of the syllabus.

{¶ 38} We agree with the trial court that the language of the insurance policy was unambiguous and that its application of the language was correct. The optional backup coverage endorsement was permitted by paragraph 9.b. and allows for coverage of loss caused by water backing up from sewers and drains, which would otherwise have been specifically excluded from coverage under exclusion 9.b. There is no other language which ties the backup coverage endorsement to the other water damage exclusions set forth in paragraphs 9.a., 9.c., or 9.d.

{¶ 39} Appellants relied on the case of *Myers v. Encompass Indemn. Co.*, 169 Ohio App.3d 545, 2006-Ohio-6076, 863 N.E.3d 1083 (12th Dist.). We agree with the trial court that this case is distinguishable on its facts. In *Myers*, an "all-risk" insurance contract provided that all losses were covered unless specifically excluded and the policy specifically excluded losses from "flood, surface water," subsurface water, or losses caused by the "faulty design, construction, or maintenance" of a drainage system. *Id.* at

17.

¶ 19. Myers purchased additional coverage to cover losses from water backed up through a drain or sewer. *Id.* at ¶ 10. While the policy also contained an anti-concurrent causation clause, *id.* at ¶ 19, it was not applicable because the damages were caused by only one event. *Id.* at ¶ 26.

{¶ 40} Myers' property was damaged when a blocked storm drain caused storm water to be forced in the opposite direction and flow into Myer's basement. The court determined that Myer's loss was due to "surface water," water that backed up because of a defective drain, and would have been excluded under the main provisions of the policy. *Id.* However, the court found that the contract language in the amendment for additional coverage "deleted policy language that would preclude coverage where another exclusion, such as surface water, already existed in the policy." *Id.* at ¶ 29. Therefore, the holding in *Myers* was based on the changes the amendment made to the policy language. In the case before us, the backup coverage endorsement only modified the language of exclusion 9.b. to add coverage that would otherwise have been excluded.

{¶ 41} Appellants also rely upon *Butche v. Ohio Cas. Ins. Co.,* 174 Ohio St. 144, 187 N.E.2d 20 (1962). This case is distinguishable on its facts as well. In *Butche*, the Ohio Supreme Court held that damage to an airplane caused by the wind while the airplane was taxiing was a covered loss even though the policy insured against losses to aircraft caused by wind but did not cover losses caused by taxiing an airplane. *Id.* at 146. The court found the policy did not contain an express exclusion for loss caused by wind while taxiing, an anti-concurrent clause, and therefore the policy coverage for wind

18.

damage applied. *Id.* We agree with appellee that the presence of the anti-concurrent causation clause in the policy before us distinguishes this case from *Butche*.

{¶ 42} We also agree with appellee that the case before us is similar to that of *Front Row Theatre, Inc. v. Am. Mfrs. Mut. Ins. Cos.*, 18 F.3d 1343 (6th Cir.1994). In the *Theatre* case, the Sixth Circuit Court of Appeals considered whether surface water, blocked from flowing through a drainage system, would be a covered loss when it flows in the opposite direction downhill into a building. *Id.* at 1345. The insurer denied a claim for loss on the basis the damage was caused by a flood. The Sixth Circuit defined "surface water" as water which flows naturally across the land, but found the damage caused by the backed up water flowing in the opposite direction intended by the drainage system, would have been covered under the policy. *Id.* at 1347. However, because rainwater from the storm contributed to the damage, the anti-concurrent causation clause in the policy barred coverage. *Id.* at 1348.

{¶ 43} In the case before us, during the second claim incident there was evidence that water entered the home through both the windows and, as a result of a backup of the sump pump system, further damage was caused by hydrostatic pressure from subsurface water. Mr. Hartman made statements to this effect in his e-mail and orally to the Fetters and Bostwick. Furthermore, Bostwick opined the water which entered the home during the second incident through the window was not water that backed up through the culvert, but was pooled water from the culvert and/or rainwater from the storm. He also opined that hydrostatic pressure caused damage during the second claim incident.

19.

{¶ 44} Because there was an anti-concurrent causation clause in the policy before us, we find coverage was excluded when there was more than one cause for the loss and one of the causes was an excluded cause. The backup coverage endorsement did not provide additional protection for property from damage caused by a combination of covered and non-covered causes.

**2. Did the Backup Coverage Endorsement Provide Stand-Alone Coverage?**

{¶ 45} Appellants next argue the backup coverage endorsement provides for separate, stand-alone coverage and is not subject to any of the exclusions applicable under the basic policy provisions quoted above. They argue that if appellee had intended for the exclusions in the main policy under each coverage type section to have been applicable to the backup coverage endorsement, it would have referenced the exclusions in the endorsement. Furthermore, they argue the placement of the endorsement at the back of the policy without reference to the water damage exclusions evidences that it was an amendment to the policy and provided stand-alone coverage.

{¶ 46} Generally, an insurance contract must be read as a whole, with the endorsement as part of the contract policy. *Ward*, 129 Ohio St.3d 292, 2011-Ohio-3176, 951 N.E.2d 770, at ¶ 18 citing *Penn Traffic Co. v. AIU Ins. Co*., 99 Ohio St.3d 227, 2003-Ohio-3373, 790 N.E.2d 1199, ¶ 30 (additional citation omitted).

{¶ 47} We find the endorsement here is specifically tied to the paragraph 9.b. exclusion for water damage caused by sewer and drain backup in the main policy by the second paragraph, which provides that the exclusion does not apply if the insured

20.

purchases specific coverage for this type of loss. The endorsement clearly adds coverage which the main policy would have excluded. Therefore, we reject appellants' argument that the backup coverage endorsement is a separate insurance contract.

### 3. Was the Water Damage Exclusion a Single Exclusion Modified by the Backup Coverage Endorsement?

{¶ 48} Appellants next argue that even if the backup coverage endorsement is construed as being subject to the main policy water damage exclusions, the water damage exclusion is a single exclusion which does not apply if the backup coverage endorsement is purchased because the word "exclusion" appears under paragraph 9.b. and at the end of section 9, and both clauses refer to the same, single exclusion.

{¶ 49} If an insurance contract provision "is reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380 (1988), syllabus. In this case, we find the language is capable of only one interpretation. The two uses of the term "exclusion" clearly relate back to two separate types of water damage exclusions; i.e., water damage in general and specifically water or sewage backup damage. The indentation structure of the paragraphs within section 9 unambiguously indicate that the phrase "this exclusion" under paragraph 9.b. relates back to only paragraph 9.b., while the phrase "this exclusion" at the end of section 9 relates back to the first clause of the entire section, "water damage." We do not agree with appellants that these phrases are susceptible to more than one reasonable interpretation.

21.

#### 4. Is the Backup Coverage Endorsement Illusory?

{¶ 50} Appellants argue that our construction would render the backup coverage endorsement illusory because there would never be a situation where there was coverage under 9.b. when exclusions 9.a. or 9.c. were applicable.

{¶ 51} In an illusory contract, the promisor "'retains an unlimited right to determine the nature or extent of his performance'" which "'destroys his promise and thus makes it merely illusory.'" *7 Med. Sys., LLC v. Open MRI of Steubenville*, 7th Dist. Jefferson No. 11 JE 23, 2012-Ohio-3009, ¶ 39, quoting *Century 21 Am. Landmark, Inc. v. McIntyre*, 68 Ohio App.2d 126, 129-30, 427 N.E.2d 534 (1st Dist.1980). Because illusory contracts are not enforceable, courts should "interpret a contract to avoid a result which renders the contract illusory." *State v. Stanley*, 7th Dist. Mahoning No. 99-C.A.-55, 2002-Ohio-4372, ¶ 22, citing *State ex rel. Gordon v. Taylor*, 149 Ohio St. 427, 79 N.E.2d 127 (1948), paragraph two of the syllabus. *Accord Cincinnati v. Cameron*, 33 Ohio St. 336, 364 (1878). If "'there is some benefit to the insured from the face of the endorsement, it is not an illusory contract.'" *Ward*, 129 Ohio St.3d 292, 2011-Ohio-3176, 951 N.E.2d 770, at ¶ 24, citing *State Auto Ins. Co. v. Golden*, 125 Ohio App.3d 674, 678, 709 N.E.2d 529 (8th Dist.1998).

{¶ 52} We find the endorsement was not an illusory contract. It is clear under the policy and backup coverage endorsement that coverage will be provided where the cause of the loss is only from water backing up through the sewers or drains designed to remove subsurface water from the foundation area. Therefore, the endorsement has some

22.

benefit to the insured. Coverage is only excluded when damage is also occurring as a result of surface flooding and/or excessive subsurface water buildup which causes hydrostatic pressure. The fact that there can be situations where the backup coverage endorsement is available prevents the endorsement from being an illusory contract. Therefore, we find appellants' second assignment of error not well-taken.

**Third Assignment of Error**

{¶ 53} In their third assignment of error, appellants argue that the trial court misconstrued the policy and erred in granting summary judgment against appellants regarding the "fungi, wet or dry rot or bacteria" loss.

{¶ 54} Even without considering appellants' excluded evidence, appellants argue appellee was not entitled to summary judgment because it failed to prove by a preponderance of the evidence that mold was not present. Appellee's own expert could not rule out the presence of mold.

{¶ 55} The policy provided as follows in pertinent part:

Fungi, Wet or Dry Rot or Bacteria Coverage

"We" will pay up to a total of $10,000 for:

1.    direct physical loss to property covered under PROPERTY

PROTECTION--SECTION 1, * * * resulting from, or consisting of

"fungi," wet or dry rot or bacteria if the direct    result of a PERIL

WE INSURE AGAINST; and

* * *

23.

The $10,000 limit is the most "we" will pay for the cost:

a.   to remove "fungi," wet or dry rot or bacteria from covered property;

b.   to tear out and replace any part of the building or other covered property is needed to gain access to the "fungi," wet or dry rot or bacteria; and

c.   of any testing of air or property to confirm the absence, presence or level of "fungi," wet or dry rot or bacteria whether performed prior to, during or after removal, repair, restoration or replacement.  The cost of such testing will be provided only to the extent that there is a reason to believe that there is a presence of "fungi," wet or dry rot or bacteria.

The coverage provided above applies only when such loss or costs are the result of the PERIL WE INSURE AGAINST which occurs during the policy period and only if all reasonable means were used to save and protect the property from further damage at or after the time of the "occurrence" of the PERIL WE INSURE AGAINST.

{¶ 56} Appellants argue that under subsection c. quoted above, that the need to test for mold is covered when there is a reason to believe that mold might be present and is the result of a covered loss.  Because the first claim incident was a covered loss, appellants argue that they were entitled to coverage for testing for mold.  Appellants

24.

argue the presence of water in the basement and the results from their positive test results for mold indicated a need for testing. Appellants' evidence of testing for mold was excluded from evidence, however, because it was not properly submitted to the court pursuant to Civ.R. 56(E).

{¶ 57} The trial court found that while appellee would have been obligated under the policy to cover mold damage resulting from the first claim incident, there was no evidence of any mold. Furthermore, while appellee would also have been obligated to test for the presence of mold after the first claim incident, that obligation was triggered only when there was a reason to suspect mold might be present. Because the restoration company paid by appellee treated the premises with an anti-microbial agent when cleaning up after the first claim incident, the trial court found there was no reason to believe that mold was present after the cleanup.

{¶ 58} We agree with the trial court. The promise to pay for the cost of testing for mold was triggered only when it is a result of a covered loss, which would exclude mold resulting from the second claim. As to the first claim, both insurance agents attested that the matter of mold was not raised and they saw no evidence of mold. Davis further attested appellee paid for a restoration company to clean the property. Furthermore, Bostwick examined the premises for mold months after the second claim and found no evidence of mold. There was no evidence in the record that mold was suspected other than the fact that a backup of water through the sump pump had occurred. But, Bostwick attested that there was little likelihood that the flooding water contained a sufficient level

of fungi or bacteria to cause damage because it was surface rain water and not sewage water. He further opined that removing the water and wiping down the surfaces would have been sufficient to prevent damage from mold and that action was taken, plus more, by the restoration company.

{¶ 59} Therefore, we find appellants' third assignment of error not well-taken.

**Fourth Assignment of Error**

{¶ 60} In appellants' fourth assignment of error, they argue that the trial court erred in overruling appellants' timely evidentiary objections to the "expert" testimony of Bostwick allegedly proffered by appellee without a proper foundation and contrary to Evid.R. 702 and 703 and the trial court erred by relying on that testimony as a basis for granting summary judgment in favor of appellee. In its April 18, 2016 final judgment the trial court denied the Hartmans' motion to strike without comment.

{¶ 61} A witness is not presumed to be an expert and the party offering the testimony has the burden to show the witness has the qualifications to testify as an expert. *Tully v. Mahoning Exp. Co.*, 161 Ohio St. 457, 119 N.E.2d 831 (1954), paragraph two of the syllabus. The trial court acts as a gatekeeper and must determine if the expert's methodology for formulating his expert opinion is reliable and the opinion testimony is relevant before allowing the expert to testify. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 24. The expert does not have to be the most knowledgeable expert. *McCubbin v. Mich. Ladder Co.*, 112 Ohio App.3d 639, 642-643, 679 N.E.2d 1142 (1st Dist.1996). Qualification of an expert is a matter within the sound

26.

discretion of the trial court. Evid.R. 104(A); *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19. On appeal, the trial court's ruling will not be reversed absent a showing of an abuse of discretion. *Id.*

{¶ 62} A witness may testify as an expert if their testimony "relates to matters beyond the knowledge or experience" of the average juror, the expert has "specialized knowledge, skill, experience, training, or education" about the matter, or the testimony is based on "reliable, scientific, technical, or other specialized information." Evid.R. 702. The expert may base his opinion on facts or data he has perceived or were admitted into evidence, Evid.R. 703. *State v. Solomon*, 59 Ohio St.3d 124, 570 N.E.2d 1118 (1991), syllabus. The expert may testify regarding his opinion after disclosure of the facts or data upon which his opinion is based. Evid.R. 705.

{¶ 63} Civ.R. 56(E) requires that an expert's affidavit for summary judgment purposes include the supporting facts upon which the expert's opinions are based and cannot state merely legal conclusions. *Nu-Trend Homes, Inc. v. Law Offices of DeLibera, Lyons, & Bibbo*, 10th Dist. Franklin No. 01AP-1137, 2003-Ohio-1633, ¶ 59. The party opposing the expert's opinion bears the burden of proving the expert's opinions are unsupported. *Holman v. Shiloh Grove L.P.*, 10th Dist. Franklin Nos. 15AP-228, 15AP-797, 2016-Ohio-2809, ¶ 20. Furthermore, the expert is not required to additionally support his opinion with tests or experiments if there was a sufficient foundation for his opinion. *Renicker v. Smith*, 5th Dist. Tuscarawas Nos. 1998AP050087, 1998AP090107, 1999 Ohio App. LEXIS 1934, *7-8 (Apr. 21, 1999). The expert must render an opinion

27.

to a reasonable degree of scientific certainty. *State v. Jackson*, 92 Ohio St.3d 436, 448, 751 N.E.2d 946 (2001).

{¶ 64} First, appellants argue Bostwick disclosed no background, education, or experience sufficient to confer upon him some expertise in the field of microbiology or chemistry, much less the ability to detect mold spores without testing. Second, appellants make two challenges to Bostwick's opinions regarding the presence of fungi and bacteria: 1.) Bostwick's opinion no mold was present was based solely upon his examination of the suspected mold areas by scratching and smelling the area; and 2.) Bostwick's opinion that it was unlikely there would be mold growth because the flooding was from rain water, was unsupported. Appellants argued Bostwick's statements regarding the presence or absence of mold lacked a foundation, are pure speculation and conjecture, and lack reliability based on scientific or technical principles because he did not conduct any mold tests and he did not examine the removed drywall.

{¶ 65} We reject appellants' challenge that Bostwick should not have been qualified as an expert. Bostwick attested that he had over 25 years of significant experience in forensic evaluations of homes to determine the cause and existence of damage to structures, including the issues of water infiltration and flood events, and has been recognized as an expert by many courts. Furthermore, he had been involved in over 100 evaluations regarding the issue of mold growth. We find no basis for concluding the trial court abused its discretion by qualifying Bostwick as an expert regarding the cause of water infiltration and flooding, including water damage and mold.

28.

**{¶ 66}** Second, we find Bostwick's statements of fact were supported by the evidence in the record. Mr. Hartman stated in his e-mail that water entered the home during the first claim incident through a backup of the sump pump during a heavy rain. Davis attested he inspected the home after the first flooding incident and did not see mold, the Hartmans did not claim to have seen mold, and a restoration company was paid to take measures to prevent mold growth. The company's invoice did not indicate mold was discovered. Finally, Bostwick's experience qualified him to give an opinion about the likelihood of the presence of fungi/bacteria in rainwater flooding.

**{¶ 67}** Third, we find Bostwick's opinions were reliable. His opinions of the presence of mold and the likelihood of mold was based on his experience and his education regarding fungi and bacteria growth in structures. He admitted he did not conduct any chemical testing of the areas, although he did check the moisture content of the area to ensure that it was within normal ranges. He specifically stated that he could not rule out the possibility of mold, but only that he could not find any evidence of mold and he believed this finding should be expected when flooding was due to rainwater.

**{¶ 68}** When all of the facts and Bostwick's experience are considered together, we find his opinion regarding the existence of mold growth was reliable and based on facts in evidence. Perhaps further chemical testing could have been conducted. But, that is an issue regarding the weight to be given Bostwick's opinion and not its admissibility.

**{¶ 69}** Finally, appellants argue Bostwick had no qualification or factual basis for opining that surface water entered the basement through the windows and caused

29.

damage. Appellants overlook, however, the evidence from Mr. Hartman's email reporting that surface water came into the basement through the windows, a fact confirmed by Fetters' inspection, as well as Bostwick's examination of the window areas.

{¶ 70} Furthermore, the issue of the amount of water that entered the basement through the windows and caused loss during the second claim incident is irrelevant. The water from both causes contributed to a significant amount of water accumulating in the basement. There was no evidence that the two separate causes of water infiltration caused separate and distinct damage. The policy excludes coverage whenever there are concurrent causes of the damage; there is no proportionality rule.

{¶ 71} Therefore, we find appellants' fourth assignment of error not well-taken.

{¶ 72} Therefore, we conclude the trial court properly granted summary judgment in appellee's favor. Because the granting of summary judgment resolved all of the issues in this case, we find the trial court properly dismissed the complaint. Having found the trial court did not commit error prejudicial to appellants and that substantial justice has been done, the judgment of the Wood County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

_____
JUDGE

James D. Jensen, P.J.
CONCUR.

_____
JUDGE